*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO JUNE 22, 2026

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

* * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA
v.
CHARLES GLENN

1:23-cr-112-PB-AJ-1
December 19, 2025
11:03 a.m.

* * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF COMPETENCY HEARING
BEFORE THE HONORABLE PAUL J. BARBADORO

Appearances:

For the Government: Sean Green, AUSA
Department of Justice
United States Attorney's Office

For the Defendant: Daniel Joseph Cloherty, Esq.
Cloherty & Steinberg LLP

Court Reporter: Liza W. Dubois, RMR, CRR
Official Court Reporter
United States District Court
55 Pleasant Street
Concord, New Hampshire 03301
(603)225-1442

P R O C E E D I N G S

THE CLERK: This court is in session and has for consideration a competency hearing in criminal matter 23-cr-112-01-PB, United States of America vs. Charles Glenn.

THE COURT: All right. Mr. Glenn is not here. I want to get the backstory of the circumstances under which he's decided not to appear today on the record and then ask counsel for their guidance concerning how I should address Mr. Glenn's absence.

I've asked a representative from the Marshals Service to be here today who's had -- was involved in the planning for Mr. Glenn's attendance at the proceeding today and has been in communication with people at the jail who have been talking, Marshals Service people and Strafford County House of Correction people. And I want to first get the story out on the record so it's clear what has happened here and then we can talk about what to do in terms of next steps.

So, sir, why don't you come up and stand up here in the middle between the lawyers and let me ask you a few basic questions.

I've had a chance to speak to you earlier this morning in chambers when I was asking about what's going on with Mr. Glenn and I got some information from you. I gave you some instructions as to how to proceed to try to encourage him to come to court. And so let me ask a few questions and then

if the lawyers have additional questions, we can discuss the right way to get that additional information.

So let's start with preparations for the -- the transport of Mr. Glenn for the hearing today. Can you give me a quick overview as to what your office was -- did to try to plan to bring Mr. Glenn to court here today?

DEPUTY MARSHAL MURANO: Yes, your Honor. This morning we had arranged for a Strafford County transport vehicle, a less than routine vehicle, to accommodate Mr. Glenn's unique needs. He's got some medical concerns, some back pain, and some -- some -- some other medical conditions.

THE COURT: What is that -- what's that vehicle? How is it different from the ordinary transport?

DEPUTY MARSHAL MURANO: Typically we utilize Strafford County transports, who are an intergovernmental agreement in our contract to facilitate transportation of our detainees to the courthouse or other facilities.

The standard vehicle utilized for those transports is largely a transport van with a steel box inserted into the back end, so it's a metal container, basically, for prisoners to be sat in for the transport.

THE COURT: And the one that you're going to have him -- were going to have him transported up today, what is -- how is that different?

DEPUTY MARSHAL MURANO: It was basically like a

police cruiser with typical seats and whatnot, I believe.

THE COURT: Okay. So more -- less -- more comfortable to the extent he has back issues that he -- I know has complained that transporting is hard for his back. This would, in your judgment, be a better way to transport him?

DEPUTY MARSHAL MURANO: Yes, your Honor.

THE COURT: Is that it?

DEPUTY MARSHAL MURANO: That was our intention.

THE COURT: And also he's expressed some claustrophobia-like symptoms in connection with transport and this was a more normal vehicle.

DEPUTY MARSHAL MURANO: Yes, your Honor. And it's my understanding and recollection that we had made similar arrangements when he refused a transport prior leaving Merrimack County for court one day and a cruiser was also utilized, to the best of my recollection, in that circumstance. So this was a workaround that we planned for to accommodate him.

THE COURT: All right. And what is the first indication today that you had that Mr. Glenn might not voluntarily come to court?

DEPUTY MARSHAL MURANO: The first indication was when I received a call this morning at approximately 6:30 in the morning from a transport supervisor with the Strafford County Sheriff's Office. Through the contract, the sheriff's

office provides transportation for the Department of Corrections. And I was told that they had already heard from the facility, Strafford County Department of Corrections, that Mr. Glenn was refusing transport.

I -- I did contact the facility directly and spoke to staff at the facility and determined that they had approached him about relocating him to the booking area, which is standard practice for someone going out on a transport for court or any other purpose, and he refused to comply and announced that he was not going to court, specifically, unless he was transferred to a new facility today.

THE COURT: Okay. So am I understanding you correctly that the information relayed to you was he was conditioning his willingness to come to court on a commitment to move him to a different facility other than Strafford?

DEPUTY MARSHAL MURANO: Exactly. Your Honor.

THE COURT: Okay. And what was -- what did you do after receiving that information?

DEPUTY MARSHAL MURANO: I contacted Attorney Cloherty -- is that how you pronounce your last name --

MR. CLOHERTY: That's correct.

DEPUTY MARSHAL MURANO: -- and I advised him of the situation, of the refusal, because this is a reoccurring theme. I wanted him to be aware and have an opportunity to speak to his client. So I encouraged him to contact the facility and

get in touch with Mr. Glenn to have a direct conversation with him about the circumstances surrounding his refusal in the hopes that he could speak to him and encourage him to cooperate and comply with transport today.

He -- I asked that he return a call to me if he had success or if he had any issues contacting his client. I did get a return call in pretty short order from his attorney advising that Mr. Glenn was not changing his position on transport today.

THE COURT: I received notice from my case manager at some point.

Jen, do you know when it was you called me?

THE CLERK: It was probably around quarter of 8:00, your Honor.

THE COURT: Around quarter of 8:00, where she relayed to me what Mr. Glenn's position was. And I -- did I ask you in that call or subsequently, I think in a subsequent call, to have the marshals send some marshals people down there directly to talk to him; is that --

THE CLERK: Yes, your Honor. During that call, you asked me to do that.

THE COURT: All right. And at some point you sent some additional people down to the jail, people who are trained in how to work with inmates, in an effort to try to persuade him to come to court; is that fair to say?

DEPUTY MARSHAL MURANO: Yes, your Honor. In fact, we had a backup plan because I suspected there might be an issue with the transport today. So we had already arranged for deputies to be on standby to conduct a transport and to directly engage with Mr. Glenn at the facility and, in fact, that's what happened. We did send a team of deputy U.S. Marshals to the facility.

THE COURT: And I made -- I made the judgment here that -- of course, the marshals will follow any lawful orders from me as to how to deal with the situation. One of the things that I considered was that clearly the marshals have the power and the authority, if I order them to do so, to use reasonable force, if necessary, to extract someone from a cell and bring them in. But one of the things I concluded very early on is that I did not think that was a viable option here because there would be a very high risk that Mr. Glenn would be injured in the effort to extract him from the cell and it would defeat the purpose for bringing him here, which is to conduct the hearing.

So I -- I ruled out any option of instructing you to use violence to try to get him out of the cell and instead I think your marshals people went down in an effort to persuade him, to try one more time to convince him to agree to come to court; is that fair to say?

DEPUTY MARSHAL MURANO: Yes, your Honor. They went

with corrections officers to his cell and spoke with him directly to give him an opportunity to refuse or explain his refusal and again he refused transport again.

THE COURT: Okay. One of the -- when I learned of his unwillingness to come to court and -- one of the things I wanted to have happen is what you did, which was to send some experienced marshals people to the court to -- excuse me -- to the jail to speak with him directly. But in -- as a backup, in the event that he was unwilling to appear, I asked you and my case manager to make inquiries of the facility to determine whether there was a possibility of providing a Zoom link to Mr. Glenn, either at his cell, if he was unwilling to leave the cell, or at the Strafford County facility where there's a -- a place where people can engage in Zoom calls. And did you make any arrangements or investigation to determine whether those were possible options?

DEPUTY MARSHAL MURANO: Yes, your Honor. I did contact the facility and in speaking with the staff members or a staff member that coordinates Zoom call hearings and that -- and those sort of communications with the Court, I did learn that they have spotty, at best, WiFi abilities at the -- in the cell block area where the prisoner is housed and that they would be able to bring him to a video hearing or video arraignment room and, as is very common, have a Zoom conference conducted, a Zoom call from that location. And in addition to

that, they could place him in a -- in the booking room, in a holding cell in the booking area, open the tray on the door, they could put a laptop outside, and they could have the hearing both visually and audibly presented to him in that condition also.

THE COURT: But those options would require him to voluntarily leave his cell to move to another place within the facility where we could arrange that connection; is that what you're saying?

DEPUTY MARSHAL MURANO: Yes, your Honor.

THE COURT: All right. And then I asked my case manager to -- to work with the people at the jail to ensure that there would be a Zoom link available. And did you make that happen?

THE CLERK: I did. I sent a Zoom link to Strafford and they received it and eventually they ended up declining it.

THE COURT: Okay. And that's -- and I understand -- I asked the Marshals Service people who were on site to go back to him one last time and tell him, we're leaving, if you want to come to court, this will be your opportunity to come to court, or you can have the Zoom link to watch.

Did your -- did your officers get a response to that inquiry when you put it to Mr. Glenn?

DEPUTY MARSHAL MURANO: Yes, your Honor. They explicitly addressed the last opportunity that he had to comply

with a physical transport to the courthouse. The officer also offered an opportunity to be present for the hearing via a video arrangement from the facility. They also underscored that there is a possibility that he's placing himself at risk of the Court proceeding without his physical presence.

THE COURT: And what response did they get when they gave him that information?

DEPUTY MARSHAL MURANO: He has refused -- he refused again and he said that he objected to the hearing taking place without him physically present.

THE COURT: Okay. I wanted to get that information out on the record. I had previously described it to -- in a brief communication with counsel.

Do either of you want to ask additional questions of the marshal's office representative at this moment?

Let's start with you, Mr. Cloherty. Is there anything you need to know?

MR. CLOHERTY: I don't have questions of Mr. Murano, no.

THE COURT: How about you, Counsel? Do you have any questions?

MR. GREEN: No, your Honor. I do not have any questions either.

THE COURT: All right. So thank you, sir. I appreciate your attention. If you could remain and listen in

in case we have any specific questions that come up during our discussions, we can put them to you here. So --

DEPUTY MARSHAL MURANO: Yes, your Honor.

THE COURT: Thank you. I think we have the basics of what happened today.

Mr. Cloherty, you were given an opportunity to speak to your client. Obviously you're not going to waive any attorney-client privilege issues, but I do want to -- do you agree you were given an opportunity to speak to your client, you were placed in communication with your client, and -- so you did have that opportunity. Can you confirm that, and can -- anything else you want to say about the nature of those communications, feel free to say it.

MR. CLOHERTY: Sure, your Honor.

It is accurate that Mr. Murano reached out to me, I'm going to say approximately 7:30 this morning, provided me information that Mr. Glenn was declining to get on the transport and asked me to call the facility.

I did call the facility. It took a little bit, but I was ultimately connected with my client. I'm not going to share the contents of that conversation. We did speak for a bit. At the conclusion of the call, his position about not coming was unchanged and I reported that back to Mr. Murano.

So I -- my recollection, I could -- if you need exact times, I probably have it on my phone, but that happened

sort of between 7:30 and 8:00 this morning.

I'll add that after I arrived here at court, I did receive an additional message from Mr. Glenn that was relayed to me by way of my office. He had contacted my office, I think, approximately ten o'clock, reiterating the same position, that he was not going to come, and that he objected.

I do have -- I do want to state his objection for the record, and I don't know if now's the time you want me to do it.

THE COURT: I'll give you that opportunity. I want to just get a little more background information --

MR. CLOHERTY: Sure.

THE COURT: -- out on the record. And all of this background that I'm speaking about is information that was gleaned in prior interactions I've had with Mr. Glenn, all of them on the record. Of course, if my memory is imperfect as to the precise facts of those cases, it -- the -- there will be a record describing exactly what the information is.

But I do want to be clear and I don't think anyone will disagree with me here, that this isn't the first time that Mr. Glenn has refused to leave his cell when he was required to come to a hearing. And, indeed, Mr. Glenn has used refusals to leave his cell on multiple occasions either to express his anger at someone or to try to make demands that he -- he won't come out of his cell unless certain things are done for him

that he wants to have done. The first instance where I recall this happening was with his immediate predecessor counsel, whose name is -- can you refresh my memory?

THE CLERK: Yes.

MR. CLOHERTY: Mr. Shea.

THE COURT: Mr. Shea.

THE CLERK: Yes.

THE COURT: At that point, the defendant was being housed up at the Berlin correctional facility. Of course, Mr. Shea is a Massachusetts lawyer. It was a three- or four-hour drive up there. Mr. Shea had arranged to go and meet with his client, drove all the way up to Berlin, and his client refused to come out of his cell to see Mr. Shea because he was frustrated with Mr. Shea.

There were -- there was at least one other occasion, I'm thinking there were two other occasions, where the defendant refused to come out of his cell to attend court hearings or expressed unwillingness to come out of his cell to attend court hearings.

I've tried to accommodate Mr. Glenn in -- at one time I rescheduled the hearing, is my recollection, but I -- I want to be very clear that I think there's a well-established record here of Mr. Glenn using the tactic of refusing to come out of his cell, either to express anger at someone or to try to extract commitments from the Court regarding how he's being

treated.

And if you disagree, I'm happy to hear your side of it, but that's -- that's what I believe the record will show in this case.

MR. CLOHERTY: And so -- so, respectfully, your Honor, I -- I do disagree on the -- I acknowledge, at least in my experience, my recollection is that there was one instance when I was here since I was appointed where Mr. Glenn at least initially refused to come out and that was ultimately resolved over a course of --

THE COURT: Well, there was an instance where I continued a hearing, didn't hold the hearing, is my recollection, the first time it happened.

THE CLERK: I'll have to go back to it. I do have on April 16th we had a status conference where he refused transport and was not in attendance and we actually had that conference. That was April 16 of '25.

I'm looking back through now to see if there's one where we --

THE COURT: Is that the one you're referring to?

MR. CLOHERTY: It's not. I recall -- and, again, I apologize. I haven't studied the docket.

I do recall a morning where we had a hearing scheduled. He declined to come. Over the course of the few hours, I worked with Mr. Murano and he ultimately did come.

THE COURT: Those are the two -- those are the two occasions. We had the issue with Shea, which you know that that happened because we talked about it at a subsequent hearing. That definitely happened.

And I have -- the April incident is the one I think that I'm recalling that you're not aware of.

MR. CLOHERTY: Right.

THE COURT: And then there's this third incident where we were able to talk him into coming and showing up.

MR. CLOHERTY: Right. So a hearing that I think originally had been scheduled --

THE COURT: Right.

MR. CLOHERTY: -- at 9:00 or 10:00 happened at noon or something.

THE CLERK: The April hearing, both attorneys were in attendance. Attorney Shea was in attendance and Attorney Cloherty was in attendance.

THE COURT: That's not the one you're talking about.

MR. CLOHERTY: Yeah, I don't -- obviously the record is -- I don't recall that one --

THE COURT: Well, there will be records about this.

MR. CLOHERTY: Yes.

THE COURT: My recollection is -- and I know because I have spent many, many hours trying, over the course of my presiding over Mr. Glenn's case, to deal with multiple

occasions of how do I deal with a defendant who is in custody and is using his unwillingness to leave his cell as a means of trying to disrupt the court proceedings.

And I -- I recall the incident with Mr. Shea because it's quite a memorable incident when a lawyer devotes a whole day of his time to drive up to see someone and they just refuse to see him. And I do recall my personal concern.

I want Mr. Glenn to be able to be present at all of his hearings. They're very -- it's a very important constitutional right that he has. And the very challenging circumstances that I have faced on multiple occasions with Mr. Glenn using this tactic and I -- and he does use it as a tactic. He told counsel here what he wants is he wants to be transferred. So if he's transferred, he'll come to court. Another occasion he said to the guard, it's not in my interest to come to court today, so he decides -- he decides not to come to court.

Those are all things on the record. I don't -- you don't have to agree or disagree.

MR. CLOHERTY: No.

THE COURT: They are what they are. But if there's anything else you want to say about that, I just wanted that --

MR. CLOHERTY: Yeah.

THE COURT: That factual background is important because my initial reaction is, okay, it doesn't -- it happens

once, let's just find another way; you know, don't go in and have a cell extraction; I don't want him to get hurt; we'll just wait. We'll -- he'll calm down we'll hold a hearing.

So I tried that once. Then we had a second time where there was an issue. We were able to get him to come to court. And now we have the third time where he's being very explicit in conditioning his willingness to participate in court proceedings on granting certain conditions.

I also want to make clear, and you'll, I'm sure, remember this, that the last time this happened, I said, you know, Mr. Glenn, I'm concerned about this and you have a right to be present, but I want you to understand I'm not going to continue to continue proceedings. When you voluntarily absent yourself, you run the risk that I will have to go without you.

Do you recall that?

MR. CLOHERTY: I certainly recall an exchange along those lines, your Honor.

THE COURT: It was to try to help him understand when I have no other option, I might -- that may be the only choice for me.

So I want to be clear. He's been personally advised about it. He's been advised about it by me in court the last time he did this. He has been advised about it today by the Marshals Service that his failure to come might mean that I would proceed without him. And I just want -- that is the

factual background that will now frame the discussion we are about to have.

So if anybody else wants to contest any of the basic facts -- I understand memories are imperfect. Mine are imperfect. We have a record. It is what it is. But that's what I think is the relevant factual record.

Does anybody want to put on the record additional facts before I ask for your advice, which is what I want to do is ask, well, what do you think I should do?

MR. CLOHERTY: So the only thing, again, respectfully, your Honor, I -- I will dispute the component, not the -- not the factual record, but, rather, the Court's conclusion about his motives in terms of his -- of doing it for a tactical reason. I will only state for the record, and I don't think we need to get into --

THE COURT: I'm open to being persuaded that it's different, but what I'm commenting on is the things he said, where he said -- tells one guard, it's not in my interest to come to court on one occasion and on another occasion tells a guard today, I'm not coming unless I get a transfer.

I also -- there are various things in the reports of the psychologist for the government that also suggest, where Mr. Glenn acknowledges, that he engages in these kind of behaviors and at the appropriate time, I can point them out to you, I'm sure you've read them, where he acknowledges,

sometimes you have to be violent to get what you want or words to that effect; sometimes I am manipulative. He acknowledges that in the record.

MR. CLOHERTY: So --

THE COURT: So I'm not drawing any conclusions. I'm just stating this is what he told me. I'm open to being persuaded that there's some -- if you can supply it, some -- some explanation for his failure to appear today that's not what he told the guard, it's something else. I'm -- I'd love to hear it.

MR. CLOHERTY: I think all I can say, your Honor, and, again, I don't think we need to get into detail here, but that Mr. Glenn suffers from a host of deep-rooted, challenging both mental health issues as well as medical issues.

THE COURT: Well, I want to explore that today. That's why we're dealing with this.

MR. CLOHERTY: No, I understand that. But I only -- I flag that -- and not just the mental health issues, but even the concrete medical issues.

And so I view his behavior ought be viewed through that lens. And so I just want to say that for the record --

THE COURT: Uh-huh.

MR. CLOHERTY: -- and preserve my objection to sort of the Court's, I guess --

THE COURT: I'm open --

MR. CLOHERTY: -- conclusion.

THE COURT: I'm only trying at this stage to build the record of what actually happened.

MR. CLOHERTY: Uh-huh.

THE COURT: So I will gladly keep an open mind as to whether Mr. Glenn's refusals to come to court have some explanation other than the one that he has given me. The one that he's given me through guards are I am doing this for a tactical reason. And that may not be. It may be there may be other reasons. I'm completely open to being persuaded on that. That's why I'm holding the hearing today, so we can take apart and analyze the competency evaluations. So I'm completely open on that. I'm just trying to -- you know, he gave reasons at the time. I just wanted to make sure that they were on the record.

Okay. Now, what do I do, guys? What do you want me to do?

We'll start with you, Mr. Cloherty. What do you want me to do?

MR. CLOHERTY: Well, again, my client objects to proceeding with the competency hearing --

THE COURT: Okay.

MR. CLOHERTY: -- in the absence of his presence.

THE COURT: So noted. Now tell me what you want me to do.

MR. CLOHERTY: Well, if I could say for the record a few additional facts that my client asked me to share that feed into his reason for not being here.

And I -- I understand the Court's concern about its time and its resources and I -- the -- Mr. Glenn shared with me that sometime in the last -- I don't have the exact date, but over the last few days, perhaps last week, he filed a complaint against a corrections officer at Strafford County under the -- under PREA, the Prison Rape Elimination Act, complaining about his treatment by several or at least one correctional officer.

He -- after that occurred -- I understand that complaint is still being investigated, but after making the complaint, he was placed in solitary or segregated confinement at the facility. I don't know exactly what the terms are at the facility. And he viewed that, or has viewed that, as retaliatory conduct at the facility.

He later learned, and I have learned also through Mr. Murano, the U.S. Marshal, that two complaints were made against him at the facility, one --

THE COURT: Against Mr. Murano?

MR. CLOHERTY: No. That --

THE COURT: Two complaints were made against Glenn.

MR. CLOHERTY: Yes. I apologize, yes, sorry for my mixing up the pronouns, but that there were two complaints that had been lodged against Mr. Glenn at the facility. One

involves a PREA -- an alleged PREA violation by Mr. Glenn; another involves, as I understand it, an inappropriate use of telephone services.

He doesn't believe that -- again, I don't have the contents or specifics of those complaints other than to say that Mr. Glenn does not believe he's had due process relating to those complaints, disputes the claims in those complaints, and doesn't think they would support him being placed in segregation.

So -- so, in addition, he asked me to share that his concerns also of being -- how he's being treated and he has -- and I don't think this is disputed in the medical record -- he periodically requires catheterization in order to urinate and that he is concerned about the -- that his medical condition, particularly the way he's being treated there, would make it difficult for him were he to come today because of that condition. I don't have a lot more specifics.

But in addition to the other issues that the Court has already put on the record, that Mr. Murano already stated, I'm sharing that with the Court as additional support for Mr. Glenn's objection to proceeding today.

THE COURT: Okay.

MR. CLOHERTY: The last thing I'll say --

THE COURT: Just to --

MR. CLOHERTY: Sure.

THE COURT: I want to be clear, though.

You're not contending that those are legitimate reasons not to attend court, are you? Because I think you couldn't even say that as an officer of the court.

MR. CLOHERTY: I -- I am not -- I hear the Court's question. My client has asked me to put that on the record as a basis for --

THE COURT: It's one thing to put it on the record. It's another thing to say and that is a legitimate reason why a -- a criminal defendant can refuse to come to court, unless the -- the judge orders relief that he seeks with respect to these collateral matters.

There is a right way to pursue this. Now, I -- I'm not -- I'm just saying if you're making a legal argument that this was the right way for Mr. Glenn to proceed, I would like to hear it. I don't think you can do that or make that argument as an officer of the Court. Can you make that argument? Are you intending to make that argument?

MR. CLOHERTY: I don't think I have more to say on those points other than what I've already said, your Honor.

THE COURT: I just want to be clear about that. It's not acceptable for a criminal defendant to refuse to come to court because he's upset with the way he's being treated. There are ways to address those issues and this is not one of them. So I just -- that's my view.

MR. CLOHERTY: Sure.

THE COURT: If I'm wrong as a matter of law, you'll tell me.

MR. CLOHERTY: The only other thing I'll say, again, to advance my client's objection about proceeding is I think the Court knows the seriousness of proceeding on a competency hearing, that it puts -- his not being present makes -- I -- makes it impossible for him to consult with me. It makes it difficult to proceed.

THE COURT: Well, 4241 entitles him to the procedure set forth in, what is it, 4247, which specifically includes a confrontation right --

MR. CLOHERTY: Right.

THE COURT: -- in the statute. So I -- I don't doubt that. Again, objection noted. What course of action do you propose? I'm seeking your advice as an officer of the court.

MR. CLOHERTY: Yeah.

THE COURT: What do you want to do?

MR. CLOHERTY: I -- I -- I am going to ask that the Court continue it to a date where we can try to get Mr. Glenn present.

THE COURT: All right. And --

MR. CLOHERTY: And --

THE COURT: And what causes you to believe that if

we continue it, as I've done in the past, is my recollection, and it has -- and it has enabled the behavior to continue, what leads you to believe that we will have his compliance at a later date?

MR. CLOHERTY: I -- your Honor, all I can say is I will work hard. I have been in communication with Mr. Glenn. I learned about this this morning. I had this communication with him this morning. I will go visit him. I will --

THE COURT: You've already done --

MR. CLOHERTY: -- use all my skills.

THE COURT: You've already done that and you are an exceptional -- you are the best qualified lawyer for dealing with a difficult client that I have ever encountered because you are -- your temperament and your patience is extraordinary. And I think you've already brought those skills to bear to the extent it's humanly possible for you to do so. I -- I -- I'm incredibly impressed with your patience, but I have no confidence that we can consistently bring Mr. Glenn to court when he needs to be in court.

And I'm particularly concerned that we're approaching the date of the trial and I am not going to subject a jury to what you, and you, and the Marshals Service, and Mr. Shea, and other people have been subjected to because of Mr. Glenn's decision-making. I will not do that.

And I -- so I -- I appreciate your skills and your

desire, but I don't think -- that's -- so when I look at the options here, I see the -- option one, use whatever reasonable force is required to bring him here; option two, continue without him and give him every possible means of monitoring the case; option three is continuing. I've tried continuing. It isn't working. I have no reason to expect that continuing will allow us to bring this already very old case to a -- an appropriate close.

We have a two-day trial. That's all we need to get to. But we don't spend our time on issues related to the trial. We're spending all our time on issues related to Mr. Glenn. And one of those issues, an important one, his competency, was scheduled for resolution today. I held a status conference with you both to try to make sure we had a process by which that could occur. I've devoted substantial time in preparing for that hearing. I have no confidence that if we continue it again that he'll show up at that point, because I'm certainly not going to order his transfer in order to obtain his compliance. That is not an option. It will never be an option. And I don't see how Mr. Glenn would not understand that.

So I see those as the legitimate options. I don't want to use force on him because he will in all likelihood be hurt and we won't be able to hold the hearing in any event. So that's really not an option.

So if continuing is not an option, using force is not an option, I'm left with the option of continuing the proceeding today. So your objection is noted, but you haven't given me an alternative that's viable, in my mind. So -- and I -- I've really been, I think, extraordinarily patient with Mr. Glenn.

And I will say I -- I have some empathy for his position. I understand this has been very difficult for him. And I will say with one exception during all my interactions with Mr. Glenn, he has been civil with me. He has been willing to abide by the rules of the court. And I thought I had managed to work out a reasonable working relationship with him. But this pattern is repeating and I don't see a way to break it.

So let me ask the government what you would like to do.

MR. GREEN: Thank you, your Honor.

Your Honor, I view the -- I view the situation like the Court does. I think Mr. Glenn has made a choice, a bad choice, but it's his choice, and it's left the Court with no choice, really, and that is we should proceed in absentia. It is far from ideal, but this is the only viable option. I actually view it as only two. I think continuances should be off the table. I think the record is clear. I'm newer to the case, but I'm familiar with the record, that he's done this in

the past --

THE COURT: I'm the only one that's been here for the duration.

MR. GREEN: Lucky you, Judge.

He's done this in the past. He will continue to do this. I think this is, as your Honor alluded to, in keeping with a personality trait that he has demonstrated and is evident from the report that I intend to submit.

THE COURT: We'll reserve judgment until we hold that hearing, whether it is the product of a mental disease or the product of a personality structure that is not a mental disease or defect, but it is definitely reflected in the documents.

MR. GREEN: It's a trait.

THE COURT: It's a trait that he -- that he is open about in his communications with the evaluators. I -- I absolutely agree with you on that.

MR. GREEN: Yes. And so, your Honor, I think, really, continuing is, in my view, not an option and that leaves the other two that you mentioned, which is in absentia or ordering that he be removed. And if there is a concern -- and I think it is a legitimate and real concern -- that there could be physical harm to him or even to the marshals if that were ordered, then it is totally appropriate and I would agree and I would recommend that we proceed in absentia.

THE COURT: There's real potential danger to the marshals in an extraction.

MR. GREEN: Right.

THE COURT: Mr. Glenn is a very large, very strong man. He's been convicted of a very violent crime. But -- and I don't -- I'm not diminishing this. If I told them it needed to be done and there was risk of harm to the marshals, they would still do it because that's what they do. And so I don't -- I'm not -- I think there is risk of harm to them --

MR. GREEN: Yes.

THE COURT: -- but the importance of Mr. Glenn's confrontation right, if I could find a way to fulfill it even if it put the marshals at risk, I would put the marshals at risk, because I don't want to in any way deprive Mr. Glenn of his confrontation right. But I -- I can't -- I can't fulfill his confrontation clause right if he's in a hospital and that's what's likely to happen.

So as important as it is for me to not want to see our marshals injured, if I thought maybe by risking some injury I could get him here and we could go on with the proceeding, I would give some thought to it. But that's not going to happen. Mr. Glenn is not going to submit to violence. I don't think anybody suggests that he would submit to violence. So he will resist and his resistance would be overcome.

I know a lot about cell extractions. I've had a lot

of cell extraction cases. I know how violent they can be. I know how dangerous they are for people. But the Marshals Service is trained to do it and they'd do it. I just don't want to expose Mr. Glenn to that risk of injury, which would in any event prevent the very reason why I would consider using the force.

I -- so that's why I'm not using it. I -- I certainly don't want to see our Marshals Service force injured, but they would do it if I told them, because they -- that's what they do if they are -- they fulfill the requirements of the law. And I would -- I know they would do it if I told them to, but I -- it isn't a viable option.

MR. GREEN: I understand that, Judge, and I agree and so my proposal would be that we proceed in absentia, even with the defendant's objection. The defendant, in my view, has made his choice and he has voluntarily absented himself from the proceeding.

THE COURT: Well, let's talk briefly about -- I don't see my Rules of Criminal Procedure up here. I've got a really -- can someone bring me a book with the Rules of Criminal Procedure? Are they here?

So I'm interested in your take on Rule 43. Have you looked at Rule 43?

MR. GREEN: I have not, because I learned of this while I was driving --

THE COURT: Yeah.

MR. GREEN: -- up here.

THE COURT: I know.

Have you looked at Rule 43?

MR. CLOHERTY: I have not, your Honor.

THE COURT: Okay. There it is. Good.

Let's -- let's look at Rule 43. All right? because -- I mean, because this isn't the first time I have had to do research on this, I just haven't done it in a while because I thought we were back on track with Mr. Glenn.

Rule 43, defendant's presence, subsection (c), waiving continued presence:

(1) In general. A defendant who was initially present at trial or who had pleaded guilty or nolo contendere waives the right to be present under the following circumstances:

(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the Court informed the defendant of an obligation to remain during trial;

(B) in a noncapital case when the defendant is voluntarily absent during sentencing; or,

(C) when the Court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

I am interested in what you understand that rule to provide, but at least on the surface it doesn't appear to expressly address the particular position we find ourselves here in.

The trial has not begun. If the trial means what we ordinarily understand the trial to mean, that is, the process that begins with the selection of a jury and concludes with the discharge of the jury after verdict, trial has not begun in this case, right, so -- and the way -- the way the rule is framed in Section (a) is: Unless this rule, Rule 5, or Rule 10 provides otherwise, the defendant must be present at the initial appearance, the initial arraignment, and the plea, that's one; (2) every trial stage, including jury impanelment and the return of the verdict; and, (3) sentencing.

Well, today is not any of those things either. Okay?

Then Section (b) says when not required. It lists a section -- circumstances where presence isn't required. I'll skip (1) and (2), which are clearly not relevant here. (3) is a conference or hearing on a legal question, the proceeding involves only a conference or hearing on a question of law; (4) sentence correction, the proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. Section 3582(c).

Today's proceeding is not a proceeding, as I

understand it, where under Section (a) the defendant's presence is required, but it's not a proceeding under Section (b), where the defendant's presence is not required.

So in terms of the -- how do I interpret that? If there is not a complete all circumstances involving a case are either when required under (a) or not required under (b), this isn't either of those situations.

So the rule doesn't seem to prohibit going without him, it doesn't expressly permit going without him, and so I think you default to the underlying constitutional right to be present and the statutory right to confrontation in the competency statute.

And I -- the way I understand those -- those things to work, under the rule, there's not -- the rule does not prohibit me proceeding without him. It doesn't specifically authorize me to proceed without him. So the rule doesn't preclude but doesn't specifically authorize.

The statute gives confrontation laws rights with respect to a -- a competency hearing. The confrontation clause is -- includes a right to be present. But constitutional rights, except in unusual circumstances where they're unalienable or when a statute or a rule disallows it -- and I'm doing this reasoning with you in real time, how I read the record, all right, so none of us has had an opportunity to do research on this.

But the conclusion I'm coming to is that this proceeding is -- is not one where the defendant must be present; this proceeding is not one where presence is expressly not required. This is a rule where the waiver rule doesn't directly permit waiver, so it's -- I don't think the rule controls this particular proceeding. I think the rule -- the -- the law that controls this particular proceeding is the statute -- competency statute and the Sixth Amendment right to confrontation.

I -- do you agree?

MR. CLOHERTY: I do agree with your Honor's analysis. I -- I am suspecting I may disagree with your conclusion --

THE COURT: Yeah.

MR. CLOHERTY: -- which -- so I just -- and I don't want to belabor it, but I do want to just state for the record it's the defense's position that the statute, particularly, I think its 4247(d) which talks about the --

THE COURT: Right.

MR. CLOHERTY: -- opportunities that need to be provided to a defendant at a hearing, I think they do have to be informed by the Sixth Amendment. And so, again, for the record, we --

THE COURT: Well, it says confrontation, confront the witnesses.

MR. CLOHERTY: Right.

THE COURT: So I think that -- that makes clear -- now, my view is any evidentiary proceeding is a critical stage proceeding at which a defendant has a right to be --

MR. CLOHERTY: Yeah.

THE COURT: -- to confront the witnesses against him. So in any evidentiary proceeding, and a competency hearing is potentially an evidentiary proceeding, is one where I think he does have a Sixth Amendment right to confrontation.

What I'm leading to is waiver is not prohibited by Rule 43, waiver is not governed by the Rule 43 for this particular hearing, and absent a rule prohibiting waiver, most constitutional rights are subject to the voluntary -- voluntarily relinquishment of a known right standard, which it seems Mr. Glenn has done here, if he's competent.

So I can't determine -- I have to determine his competency and then say, okay, if he's competent, then he has the ability to waive his right of presence at this hearing. He's done that. So it's not a Rule 43 waiver. It's an ordinary constitutional right waiver.

Okay. So the Marshals Service wanted you to know, Mr. Cloherty, that he's received word from Strafford that Mr. Glenn stated he has fired his attorney effective today.

So Mr. -- Mr. Glenn doesn't get to fire his attorney in this circumstance, you're not fired, but you should be aware

that he has informed people that he thinks he's fired you.

So -- but I -- I am not going to excuse you at the present time. I'm going to reason through this in the step-by-step way I'm doing it. First, I've built the evidentiary record. Second, I've asked for your advice, we've identified options. I've now asked for a legal analysis that I'm doing with you in real time. I've taken my position initially that you seem to agree with that Rule 43 doesn't provide the answer. I think we agree that Mr. Glenn does have at this stage a right to confront that derives both from the statute and from the Sixth Amendment. And the only question is has he, by refusing to come to court today, waived that right in a way that sufficiently allows it to proceed without him.

You say no, on his behalf you assert the objection you've asserted. Is that correct?

MR. CLOHERTY: I think that's where I am, your Honor. I think you've heard me on that. I think the importance -- and I'll add that I also think it's so critical, and I know the Court understands it, when a -- something like a competency hearing is going on to not be able to consult with counsel in real time, it's not only about his confrontation clause rights, it's about his right to counsel throughout the proceeding. So I --

THE COURT: If I could find a way to get Mr. Glenn to be here and I -- that's part of the reason, even if he

didn't want to be here, to give him a right to watch on Zoom and call when he needed to talk to you, I would have accorded all of that, put you in another room, put you in a breakout room with him, you could talk with him all day about his strategy and so forth. It's his choice that he's not doing that, not mine. So, in any event, I get -- you've made your position clear.

So the -- the sort of real-time legal analysis that I've just done with you, does it -- do you see anything that is problematic in that analysis?

MR. GREEN: I don't, your Honor. I will say that I'm doing it in real time as well.

THE COURT: Yeah.

MR. GREEN: This is not something --

THE COURT: All right. Well, we can always redo it. If somebody, you know, discovers there's a controlling case that nobody, you know, thought of, what's the worst offense? The worst offense is, okay, we redo it, continue it to infinity and then if he ever decides to come, we -- we can do the hearing at that point.

I -- I mean, we also have to understand, Mr. Glenn's a -- it is not irrational, his incentive structure here. What is his sentence on the -- the second degree murder?

MR. GREEN: I've seeing varying --

THE COURT: It's like a 30-year sentence, isn't it?

MR. GREEN: I thought it was 30. The report says 40.

THE COURT: And under New Hampshire law, he is -- basically serves that time. There's, you know, a little bit of good time, but basically whatever happens here, he's facing decades more in prison. All right? So the -- his immediate gaining of an acquittal on this charge is not his highest priority. He has other priorities, which we will get into during the competency hearing.

All right. So if we have to redo this, I -- if somebody comes back and does the research and says, oh, you know, this is terrible, we need to redo it, I'll redo it. But I -- my view is his behavior today, I've given him multiple -- I've given him a personal warning about -- that I was going to proceed without him, as a general matter, if he started refusing to come. I've instructed the Marshals Service to give him that warning and opportunities to come back, to come into court. He has stated his refusal. He's explained that he's -- he's refusing because he wants me to agree to transfer him to a different facility and he's using the threat of nonappearance as a way to try to get me to order something that I'm not prepared to do. That is a knowing, voluntary, and intelligent relinquishment of his known right under circumstances where I am satisfied he has effectively waived his right to be present at this hearing unless I, in conducting the hearing without

him, determine that he's not competent. If I determine he's not competent, then I have to reassess everything that I have done.

So that's my finding on the record, doing the real-time legal analysis that I've done with the factual record that is -- I have made today.

And your objection, Mr. Cloherty, on behalf of your client, is fully preserved.

I think we should now proceed to the -- take a break and proceed. And we'll go for a little while, but we're not going to be able to finish in all probability with the competency hearing. Let me just say one more thing before we get into the actual competency hearing.

One of the things I made clear to counsel, and I assume you made clear to Mr. Glenn, was that in holding this competency hearing, I would allow you to call any witnesses, including the government examiner, Dr. Mart, anybody else you wanted to call at the competency hearing. And I did ask and instruct you to give me notice, both of you, if you were intending to call any witnesses at the hearing and that if you didn't call witnesses, I would proceed to make the judgment about competency on the basis of Dr. Mart's initial report, the government examiner's report, and Dr. Mart's supplemental report.

We got no notice that either of you were intending

to call witnesses. Obviously there's always a possibility that something would change at the last moment and you would seek permission to try to call somebody as a witness. I'm not ruling that possibility out. I -- but I did require you to tell me in advance if you were going to -- knew you were going to call somebody and nobody did and I just want to confirm on the record that nobody at the present time was intending to call any other witness, they were intending to allow me to make the judgment about competency on the basis of the reports.

Does anybody deny that?

MR. GREEN: For the government, that is correct, your Honor.

MR. CLOHERTY: That's correct, your Honor.

THE COURT: Okay. Good. I want to be sure about that because I could see somebody spinning this in a different way.

But, no, I -- I gave -- I let counsel dictate to me what they wanted to do. If they wanted somebody brought in, bring them in, cross-examine them, do what you want. I was not trying to deny anybody confrontation clause rights. I was open to doing that. The lawyers, I think rightly, for good reasons for both sides, decided that the competency issue should be addressed on the basis of the reports. So I think that is the correct decision. But it was counsel's decision, not mine.

Okay. Can my reporter -- how tired are you? Can

you go a couple more minutes?

All right. The government -- so do you want to -- to start with the competency hearing, where I think what we should do is give the government the opportunity to -- because the government's burden -- it's the government's burden to try to persuade me that Mr. Glenn is competent and then give you a chance to respond although the examination was done in a different order.

It is the government's burden, right? So --

MR. CLOHERTY: I -- I suppose it is, albeit the Court's determination. But I -- it might be helpful, I guess I'll leave it up if the government disagrees, for me to at least introduce the topic because of where we are.

This is an unusual --

THE COURT: I'm -- I'm fine with that as long as everybody's clear that it's my judgment that the burden of proving competency is on the government under the First Circuit case law.

MR. GREEN: I would agree with that, your Honor, but I'm happy to -- if your Honor would like --

THE COURT: I'm fine with that, yeah.

MR. GREEN: Okay.

THE COURT: Good. So why don't you take a few minutes and kind of lay out your argument referring to the reports where it's appropriate to do so.

MR. CLOHERTY: I -- I am, your Honor, and this is why this hearing is a bit unusual. I -- I'm not going to portray myself as a competency expert. This has periodically come up during the course of my career, but I've learned a lot over the last few months.

But the -- what's different about this matter is I think it's clear in Dr. Mart's original report and in his supplemental that the defense is not taking the position that Mr. Glenn is incompetent. So this is not, I think, a classic situation where you've got, you know, sort of dueling reports that are -- that are really on opposite ends of the spectrum.

What --

THE COURT: Do you argue that Mr. Glenn is incompetent?

MR. CLOHERTY: I do not, your Honor. What I argue is -- and this is why I think it's a little more nuanced than -- than maybe your typical case. Under First Circuit law, when I received -- and I think this was clear, at least at one of our hearings.

When I received the report back from -- the initial report from Dr. Mart, it raised competency concerns, serious competency concerns, that I felt, looking at my understanding of First Circuit law, I had an obligation to bring to the Court, irrespective of whatever my client's personal position might be on this, that there are serious concerns. And it

really goes to the *Dusky* standard. And I don't think there's a dispute between both experts that Mr. Glenn has, you know, an adequate factual and rational understanding of what's going on in the proceedings.

The -- the nuance that Dr. Mart has identified is -- under the *Dusky* standard is whether Mr. Glenn's conditions, which include PTSD and a number of other sort of related conditions, are such that they interfere with his ability to meaningfully participate in his defense, which is of -- a prong of the *Dusky* standard. And in Dr. Mart's supplemental report, what Dr. -- acknowledging these concerns, he doesn't come to a conclusion that Mr. Glenn is incompetent, but, rather, makes a recommendation about some potential medication regimens that would allay those concerns.

So -- so it's a -- it's a little more nuanced than me saying he's incompetent. We're not suggesting that. I do -- and I'm guessing -- and maybe this is going too far for the Court. But what I --

THE COURT: Well, can we -- can we tease out what I think is there is absolute agreement in the reports, there is no dispute by anyone here that Mr. Glenn is able to understand the nature and consequences of the proceedings against him.

You agree?

MR. CLOHERTY: Agreed.

THE COURT: No one says otherwise. So that's off

the table. It's -- that's the first prong of the analysis. The only issue is with respect to the -- the -- now, let me -- I'll say there is a precondition in the statute on which there is disagreement, that is, there must be a mental disease or defect. And the government examiner disagrees with the -- that there is a mental disease or defect.

And it seems, although Mr. -- Dr. Mart is -- he doesn't really say things conclusively, but he says he's suffering from -- he clearly diagnoses him, the way I read it, as suffering from CPTSD --

MR. CLOHERTY: Uh-huh.

THE COURT: -- which I believe he would consider to be a mental disease or defect, whereas the government examiner says he is not suffering from a mental disease or defect, he has a diagnosis of PTSD by history and he suffers from antisocial personality disorder, which the examiner doesn't believe is a mental disease or defect. Implicit in that is a disagreement on a pure question of law, that is, what is a mental disease or defect.

MR. CLOHERTY: Right.

THE COURT: And so I think there's potential disagreement. There's mental -- there's disagreement on the legal question, what is a mental disease or defect; there's also disagreement about his precise diagnosis as to what the mental disease or defect is.

Dr. Mart, again, he kind of dances around the issue. He recognizes that Mr. Glenn has personality disorder in addition --

MR. CLOHERTY: Yeah.

THE COURT: -- to CPTSD. It's unclear whether he's calling it borderline personality disorder or antisocial personality disorder, but what he describes fits antisocial personality disorder. He didn't really say it. So I think they largely agree that Mr. Glenn suffers from personality disorders. The examiner says straight up it's antisocial personality disorder.

Ordinarily, personality disorders that are unaccompanied by other features don't undermine competency. I'm not saying -- the government examiner says they can't, they don't, but I think the government examiner misunderstands the term mental disease or defect. It is broader -- I think both Dr. Mart and the examiner don't -- they don't understand the legal term in the way that I do.

MR. CLOHERTY: Uh-huh.

THE COURT: It is not all or nothing in the way that they're suggesting --

MR. CLOHERTY: No.

THE COURT: -- that one either is -- if you get a diagnosis, you have a mental disease or defect; if you don't, you don't have a -- you just have personality disorder, you

can't. I think a mental disease or defect is -- it's an archaic term. It predates modern psychology. We now use the -- we now deal of the question of mental disorder.

MR. CLOHERTY: Yeah.

THE COURT: We don't deal with mental disease or mental defect.

So the term means -- but it means something more than mental disorder because the DSM characterizations of mental disorders are extremely broad and people can have disorders at different degrees which no one would say -- like I have -- I've taken guilty pleas from hundreds of defendants with PTSD.

MR. CLOHERTY: Uh-huh.

THE COURT: Hundreds. The data about personality disorders among prison population is as high as 30 or 40 percent of prison inmates would qualify either under borderline personality disorder, narcissistic personality disorder, or antisocial personality disorder.

So the data is a huge chunk of the prison population has those things. I take pleas from those people every day, pleas from people with PTSD every day. Those are mental disorders, but they're not necessarily a mental disease or defect that renders somebody incompetent to the extent that.

So I think the government examiner is wrong when they answered the question is there a mental disease or defect,

no, and Dr. Mart is wrong to the extent he says, well, because somebody has CPTSD, they necessarily have a mental disease or defect. It's a much more multifactor totality of all relevant circumstances assessment and it's a legal question, not a -- a question for a psychologist.

MR. CLOHERTY: Yeah.

THE COURT: I take their input and I decide whether somebody has a mental disease or defect that renders him incompetent to the extent that either they can't do part one or they can't do part two.

MR. CLOHERTY: Okay. So -- and I appreciate that thoughtful analysis. And I don't think we're really -- I don't think there's a huge dispute here.

THE COURT: Yeah.

MR. CLOHERTY: Again, the defense's position here is really about -- we have -- I think there's no dispute that Mr. Glenn has a complicated set of disorders that impact his behavior in many ways.

THE COURT: Yeah.

MR. CLOHERTY: And I think what --

THE COURT: I'm inclined to agree with Dr. Mart. Although the -- the -- I have -- I have probably more than -- substantially more than you -- do have experience with the DSM and I've had many experts testify about these conditions, so I do have a lot of experience with it.

CPTSD is not a DSM diagnosis. It's a diagnosis based on a different criteria that I've never had any experience with. But I'm prepared -- my preliminary assessment is that I agree with Dr. Mart that he suffers from CPTSD and I think he suffers from personality disorder, antisocial personality disorder. I'm not sure Dr. Mart would disagree with me on that because he kind of dances around the issue of what kind of personality disorder he has, maybe it's borderline, maybe it's antisocial personality.

But there is -- so to the extent the government examiner doesn't agree with Dr. Mart about CPTSD, I'm inclined to agree with you that he has that.

MR. CLOHERTY: And so, to me, it's really a question of how does his condition impact that second prong --

THE COURT: Right.

MR. CLOHERTY: -- of the *Dusky* standard.

THE COURT: We don't have to consider the first prong at all.

MR. CLOHERTY: Agreed.

THE COURT: We only have to consider the second prong.

MR. CLOHERTY: And this is where, again, it becomes a question of law because I'm sure the Court would -- I hope the Court would agree with me that that second prong is also informed by the Sixth Amendment as well, right? Your ability

to meaningfully participate in your defense is sort of a fundamental -- it's what animates the Sixth Amendment.

THE COURT: So wait. I just want to be clear. Step one, I said I agree with you and Dr. Mart that he has CPTSD and borderline personality disorder. Step two, there's no dispute that he has the first part of the *Dusky* test. He's competent.

MR. CLOHERTY: Agreed.

THE COURT: So we're down to a narrow dispute about whether he can assist in his defense as a result of a mental disease or defect and on that you say even Dr. Mart isn't opining that he can't. He's saying I have serious concerns about whether he can, and he proposes in his rebuttal a medication regime, although he's a psychologist, not a psychiatrist, and that he thinks would help him be more effective at helping his lawyer and assisting in his defense.

MR. CLOHERTY: Right. And I -- I guess, again, I'm -- I'm certainly not a medical expert. I will say that strikes me as true in the sense to the extent that, you know, SSRIs like Ativan or beta-blockers, which just help someone calm down, may -- could well be helpful. I'm aware that that has helped other defendants in the past. I'm not -- again, I'm not testifying as an expert. And what he's really recommending is a psych consult and let's see if we can do that. And he really stops there. And that, again, is --

THE COURT: Well, I have no objection. If you want

to get him to a psych consult, go ahead. If you want to get him on -- if he wants to be on medication that a psychiatrist thinks he should be on, go ahead. But that's not for me. You know, I -- I -- I don't know that I could -- I mean, under the regime, I'd have to commit him and see if he -- I'd have to find he is incompetent, I'd have to then commit him, see whether he'd agree to take the meds, and if he wouldn't take them, then I'd have to see if I can force him to take the meds. But I don't have the power to do any of that until I find he's incompetent.

MR. CLOHERTY: I suppose --

THE COURT: You could do it and I would support it. If you wanted to get a psych consult and get on some new meds and you told me, Judge, he's on -- he's had a psych consult, some new meds have been prescribed, I think it will really help my ability to work with him if he takes them, he's in agreement to taking them, we'd like to continue the trial for one more 30-day tranche to give these meds some chance to take effect.

But that's not competency. That's an I want to -- I want to do this and I need another continuance to give it time to work.

MR. CLOHERTY: And I -- I generally agree with you, your Honor, and that's really, I think, where we are, based on his report. And just to be clear, the type of medical regimen -- and this is where I do think we need the Court's

involvement to a certain degree. This is not that he needs these meds on a daily basis to function in the facility and I -- it is, rather --

THE COURT: No, but you could file a motion with me that is not for a competent defendant that is along the following lines: Judge, my client suffers from mental health problems. They're not so sufficient as to undermine his competency, but they are affecting my ability to work with him. And Dr. Mart has informed me that if I could get him on these medications, he would likely be more effective at working with me, and I would like you to approve the appointment of an expert and the -- if the expert orders the medication and he's allowed to take it and he's willing to take it, to give that medication some time to work. And so I'm asking you in one motion to appoint -- to -- you've got to find the psychiatrist, to pay the psychiatrist not to evaluate but to treat --

MR. CLOHERTY: Yup.

THE COURT: -- and allow -- but I'm not going to order him to take meds. That's a whole other issue of, you know, we could have another year of litigation over that. I'm here now, today, to determine competency. And I have two reports, one by one doctor that the most he'll say is I have serious concerns, the other who says quite clearly, no, there are good reasons -- he's making bad decisions, but he's making bad decisions because of his bad personality, not his

incompetence. And that is -- that's the issue for today. The issue for tomorrow would be if you wanted to do this.

I don't think it's frivolous. I -- and you know how much I do not want to have any more continuances of this trial. But I -- and I don't think Dr. Mart is really -- has sufficient expertise to say whether these things would work or not. I think you'd have to get a psychiatric consult. You need a medical doctor because Dr. Mart can't prescribe medication.

MR. CLOHERTY: Exactly right, your Honor.

THE COURT: So you need a psychiatrist. The psychiatrist would have to evaluate him. The psychiatrist would have to agree with Dr. Mart that these medications are warranted for him given his mental health problems and will assist him in working with you and Mr. Glenn wants to take the medication. All those things would have to be present before I would consider continuing a trial.

But if you want to do that and you need cooperation from the Court to get it done, I'm willing to do that by motion. But, as I said, I'm not moving that trial date till I see a psychiatrist has seen him, psychiatrist has prescribed these meds and said it will help assist with his defense, and Glenn has expressed a willingness to take them. And then the minimum continuance I would need to allow the medication to come into effect, I would -- I would consider it, yes. I'm sure the government would object, but --

MR. CLOHERTY: Yeah.

THE COURT: -- I'm willing to -- would be willing to consider that, only under those conditions, though.

But, you know, you -- as I said, the problem with -- you -- your doctor does not opine that he is incompetent.

MR. CLOHERTY: Agreed. And we don't -- and I -- certainly Mr. Glenn has not asked me to advocate for his incompetence. We take don't that position. So it really is that -- and we were careful about this. Again, I had an obligation, in my view, to raise these serious concerns with the Court and we raised them. Again, I think that that prong of the competency standard, it's not just about -- it certainly relates to competency, but there's an overlay with the Sixth Amendment to the Constitution.

And so I -- I am going to take up the Court's invitation about precisely the type of motion you're talking about. I don't know how quickly I can identify an expert, but I will try to get something -- my hope is to get something to the Court Monday or Tuesday or, you know --

THE COURT: Okay.

MR. CLOHERTY: -- almost immediately. But that's, I think, after -- and I appreciate -- after this whole --

THE COURT: So you're not arguing he's incompetent. The government's not arguing he's incompetent. I largely agree with both of you. He's not incompetent. I agree -- my view is

he suffers -- in reading these reports carefully, my -- my view, subject to hearing what the government says, probably after lunch, is that Mr. Glenn is a highly -- much more intelligent than his IQ score tests suggest. He's extraordinarily knowledgeable about the law. He's extraordinarily engaged with trying to pursue what he sees as his interests. He believes he's done nothing wrong. He believes that he should be acquitted of this charge. He has a set of demands of lawyers that lawyers are unwilling to -- to comply with. No lawyer has been willing to satisfy him in terms of the various things that he has asked the lawyer to do because very skilled, very able lawyers understand that that is not in his interest to do many of the things he wants to do and he doesn't like that. And as -- as a result, he has difficulty. He fires lawyers. He makes bad decisions about what is in his interest.

I agree with you that his mental health problems do cause him to be somewhat impulsive and that he can -- he gets frustrated when he doesn't get what he wants. And when he doesn't get what he wants and he gets sufficiently frustrated, he blows up. And I would only imagine -- I know he did this with the other lawyers who worked with him and despite your tremendous patience, I would be surprised if he didn't do it with you. With me, he's only done it once. He's been very self-controlled because it's strongly in his interest to do

that. But he gets frustrated when he doesn't get what he wants. That doesn't make him incompetent. That he has bad judgments about what his theory of defense is doesn't make him incompetent.

He is highly strategic in pursuing things that are in his -- as he perceives it are in his interest and he's willing to use his explosiveness, and even violence, the threat of violence, as a way to get people to do what he wants. That's, indeed, part of what the charge here is about.

But that isn't the product of a mental disease or defect that would render him incompetent to the extent that he can't assist in his defense. It's that he wants to pursue a particular approach to defense that no lawyer can deliver for him and he has expectations in the face -- and you don't have to comment on this -- a case where the evidence presented to me in connection with the motion to suppress presents an overwhelming case of guilt of the charge. And so -- and I have never once heard from any lawyer representing him any clue as to what a viable defense is. I would love to know what it is.

So if you're facing evidence that is overwhelming of guilt with no ability to have a viable defense but a belief that you're innocent and this is wrong, what's going to happen? He's very frustrated. I understand that.

MR. CLOHERTY: Well, and I -- I don't think today is the day to talk about defenses, but -- although I appreciate

the Court's concern and how you've tied that into what we're talking about.

But what I -- all I think -- our position really is summed up in the very end of Dr. Mart's report where he simply says that a medication regimen he believes -- and, again, we'll have to get the blessing of a psychiatrist -- would allay concerns about his ability to participate meaningfully in his defense. And I think that would resolve any concerns about incompetence, but also, to me, more significantly, concerns about Sixth Amendment concerns.

I have concerns and the Court may share these about his ability to sit through even a short two-day jury trial in a way that would be -- allow him to, you know, fully exercise his Sixth Amendment right. So that's -- so we do intend to file a motion.

THE COURT: People have a right to the assistance of counsel, but they also have a right to make decisions for themselves. He has a fundamental right to decide for himself, and even to make bad decisions. Okay? It is -- it is even more basic a right, constitutional right, than the right to counsel. It's essentially a right to self-determination except in certain circumstances where the law doesn't allow you that right. And he has a constitutional right to be wrong unless he is suffering from a mental disease or defect that is causing him to be incompetent.

I respect his right to try to pursue whatever he thinks is the appropriate defense. You can't do everything he wants. No lawyer can do everything he wants. And I'm going to rule in accordance with law. He can try to do what he wants to do. And it's -- if it's against your advice and against the advice of the other two great lawyers who I appointed to represent him, it's probably bad decision-making, but he has a right to do that. Right? You agree he has a right to make bad decisions about himself.

MR. CLOHERTY: He does, your Honor. I -- and, again, I guess this is now going to be advanced in my motion. I just -- I do think that he -- he suffers from a host of complex disorders that if there's a medication regimen that would assist him in -- to participate in a meaningful way with the trial and to better help him make those decisions, that seems to make sense to me. It would better protect his Sixth Amendment rights as we go through this. And so I'm going to try to get that to you.

But that's really where we landed here. I did not -- believe me, I don't think Mr. Glenn or anybody -- we didn't want to go through what was a difficult and painful three months of -- you know, the evaluation. I understand, you know, what had to happen, but this is how we came out of it and -- and I felt, in particular, Dr. Mart's report, it rang true to me in that of course he understands what's going on here and

yet there is this -- there's these underlying disorders that if we can work on to allay them, his constitutional rights will be better protected. And so that's where we've landed.

THE COURT: Okay. So it's not really a competency issue. It's more a Sixth Amendment right, assistance of counsel issue, that you feel -- and, again, do you understand why there have to be these predicates?

MR. CLOHERTY: Yes.

THE COURT: A psychiatrist has to say, I'm the expert on medicines, I think these medicines will help him.

MR. CLOHERTY: Might help, right.

THE COURT: And then the second part is Mr. Glenn, as a free human being, even though his liberty is restrained, he still has bodily autonomy, rights to self-determination within the constraints of the prison system, and he can say no to the medication. And until he -- he takes it consistently for a month, I'm not going to believe he's going to consistently take it. A lot of the medications that are being suggested here people don't like to be on after a while and I -- I'm not going to force him to take those medicines.

Okay. But -- bottom line is the defendant's not arguing that he's incompetent and he -- he acknowledges that his own expert's report doesn't support a finding of incompetency.

What do you want to say?

MR. GREEN: I should probably say very little in light of that setup, your Honor, despite being a lawyer. I'm going to say very little.

THE COURT: Okay.

MR. GREEN: We're at a competency hearing where no one contends that this person is incompetent, not defense counsel, not me, not either of the drafters of the reports. There were reservations expressed, but that's it, from Dr. Mart. Reservations are -- you know, it was flagged for your Honor and that's it. And Mr. Glenn himself doesn't view himself as incompetent, not that he's the ultimate arbiter. Your Honor is the arbiter of that. But he stated that he does not view himself as incompetent. So no one contends that this individual is incompetent.

I will say, I think, only this. What we have here is someone who has a deep-seated and genuinely felt distrust of the legal system that extends to his counsel --

THE COURT: And there has -- he has reason to have distrust. These are --

MR. GREEN: Correct.

THE COURT: -- rational reasons. Concern about structural racism in the prison -- the operation of the prison system, I'm not saying it's warranted, but it's a very widely held concern and he expresses that. He expresses that concern that he can't get a fair shot.

His victim is a criminal defense lawyer. His alleged victim is a criminal defense lawyer. He has concerns about a -- that lawyers are a group of elites that are very different from, as he calls it, people like him who don't have a chance, as he says. Those are -- I mean, if we surveyed the prison, very high percentage of people in the prison would have those concerns. They're not irrational concerns. I tried to address those concerns by appointing lawyers for him that don't have any connection to the New Hampshire Bar, but they're not irrational concerns.

And he's -- this is why I bring in the issue of the evidentiary strength of the case and the absence of available defenses. When you're facing a very strong evidentiary case and there is no apparent defense that any defense lawyer has yet made me aware of, the incentives to try to push harder for other ways of getting at the case -- and neither of you have been involved with this case long enough to fully appreciate this, but, as Mr. Glenn acknowledges in the report, he's a very litigious person and he used litigation to obtain access to a bunch of records and he believes that lawyers should be doing more about that than they're doing. And it's not -- that he wants that is not irrational. Lawyers just can't do that for him in the way that he wants.

He wants all of his lawyers to report the alleged victim to the Professional Conduct Committee. And he -- it's

not irrational for him to want to do that. He's very angry at the victim and he wants her to suffer. It's not irrational that he wants to do that, but lawyers are not going to keep doing that for him.

He is constantly trying to get lawyers to do things for him that they won't do and so that he's frustrated by lawyers is not surprising or irrational. He's making bad judgments about how to address this issue, but he has a right to make bad judgments and that doesn't mean he's incompetent.

MR. GREEN: I agree entirely. So I'm going to say nothing, your Honor. What you've just said is essentially my argument, in your words.

THE COURT: Okay. Yeah.

MR. GREEN: I believe he is entirely a competent individual and the Court should find as much.

THE COURT: And he has said to me -- I mean, you've got to understand this. He has said -- when I talked to him about why are you interacting with your lawyers like this? The two lawyers I appointed to him, you maybe don't know them. They're highly, highly effective lawyers. They have personality traits that can make them a little bit abrasive, which was the wrong combination with Mr. Glenn. Instead, we found Mr. Cloherty, who's like the most accommodating person ever to exist on the face of the earth.

But he -- yeah, he -- he has said to me, when I'm

asking him why are you making these demands and reporting your own lawyers for professional conduct violations, he's doing it strategically. He said it to me. He's saying I need to preserve my ineffective assistance of counsel claims. He's thinking multiple steps ahead, that he is likely to be convicted and he wants an adversary relationship with his lawyers to preserve what he thinks is a viable ineffective assistance of counsel claim.

Is that a wise decision in my view? No, it is not a wise decision. But that's what he's doing. You don't understand that and you -- if you don't understand it, you haven't been engaged with him for a sufficient amount of time. I've had much more contact with him than either of you, than the examiners. I've been engaged with him over the course of, what, over a year on this stuff? And I -- I think I have a pretty good understanding of Mr. Glenn.

So all right. So rather than keep the lawyers here for the lunch break, at the risk of my court reporter resigning and walking away, could you -- could you go for another ten minutes while I explain my ruling here, unless either of you have something more you want to say?

MR. GREEN: Your Honor, if I may, this is just a formality. I do have a marked copy, if you need it, of the report although I know your Honor already has it.

THE COURT: Yeah, the report -- the -- the Mart

report, the government's report, and the supplemental should all be made as exhibits and maintained under seal.

THE CLERK: Okay.

THE COURT: So --

THE CLERK: Can we release Mr. Murano?

THE COURT: Yeah. Sorry. Yeah, you had to listen to too much.

DEPUTY MARSHAL MURANO: Thank you, your Honor.

THE COURT: Yeah. All right.

So I am prepared to rule and I'm going to rule from the bench on the issue of the defendant's competency.

So I believe that the government has the burden to prove competency by a preponderance of the evidence.

Does anybody disagree with that?

MR. GREEN: No, your Honor.

MR. CLOHERTY: No, your Honor.

THE COURT: So I start from that -- that premise.

As I've suggested, by looking at 4241(d), I think I derive the basic standard. The standard requires that in -- in order for there to be incompetence, the defendant must be presently suffering from a mental disease or defect. The mental disease or defect must render him mentally incompetent to the extent that either he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

I want to just briefly summarize things I've alluded to and that is to identify some places where I agree with the -- agree with Dr. Mart, some places where I disagree with Dr. Mart, some places where I agree with Dr. Sunder, and some places where I disagree with Dr. Sunder. But in doing so, I don't want to lose sight of my ultimate conclusion, which is that I am -- I am highly confident that Mr. Glenn meets the standard for competence to stand trial and that he -- that the government, therefore, has met its burden of proof here and I do find that he is competent.

Let me explain some points of agreement and disagreement and then I'll sum up.

Whether someone is suffering from -- what is a mental disease or defect is a legal question. It's a question of what the statute requires, not a question on which psychologists have greater expertise than the Court. The Court has greater expertise on what the statute requires than the Court -- than the psychologists. And, in my mind, neither psychologist understands the legal term correctly.

A mental -- whether someone has a mental disease is not the same thing as saying whether they suffer from a mental disorder as listed somewhere in the Diagnostic and Statistical Manual of Mental Disorders. Some disorders will qualify as mental diseases, some disorders won't qualify as mental diseases. Some will under some circumstances and not in

others.

Generally speaking, a personality disorder like antisocial personality disorder, standing alone, doesn't qualify as a mental disease. Generally, a -- PTSD or CPTSD can, under some circumstances, qualify as a mental disease that renders somebody incompetent and sometimes it is not sufficient in and of itself to cause somebody to be incompetent. You have to look at the way the -- the disorder presents in the defendant, how it manifests itself, what the symptoms are, how serious the symptoms are, before you can say whether something is or is not categorically a mental disease or defect. I'm not even willing to rule out the possibility that in some unusual circumstances, a personality disorder like borderline personality disorder or narcissistic personality disorder can be so serious as to affect competence. I'm not going to take an all-or-nothing position on that. In my view, the -- the term is broad enough to encompass the mental health conditions that Dr. Mart identifies here. So it's broad enough to encompass his -- his diagnosis of CPTSD and to the extent the -- Dr. Sunder doesn't believe that, I think she's operating with a mistaken understanding of the phrase mental disease or defect.

As to what his mental health diagnosis is, I -- I accept Dr. Mart's diagnosis that the defendant suffers from CPTSD. That's not a DSM diagnosis, but it's one that I think

is acceptable and I am persuaded that he does meet the terms and conditions for that particular mental disease.

I also believe that -- with Dr. Sunder that Mr. Glenn suffers from an antisocial personality disorder and he has both of those conditions in combination, but he -- but neither alone nor in combination do those conditions prevent him from being competent to stand trial.

Let me address the statute and the *Dusky* standards.

First, there's a two-part analysis that's required and on the first part, everyone agrees, both examiners agree, the lawyers agree, and I agree, that he is -- Mr. Glenn is well able to understand the nature and the consequences of the proceedings against him.

He is one of the more knowledgeable criminal defendants I've dealt with over 30 years. When he starts to delve into the details of the extradition laws, he exhibits a depth of knowledge that is almost unparalleled when it comes to criminal defendants. I think he's also, frankly, more intelligent than the reports suggest based on his early, young-age IQ testing. And there's just no question he understands the nature of the proceedings and he is very heavily engaged in his defense. He has detailed understanding of the evidence against him and he has actively engaged in thinking about his defense and trying to put himself in a position where he preserves every possible issue for appeal in

the event that he is convicted.

The problem is not that he is not able to engage with his defense. The problem he has is he doesn't like it when lawyers don't follow his directions. He wants to control the lawyers that represent him. And that's rational. The lawyers don't go to jail if he gets convicted, he does. So it doesn't surprise me that he would want to have his way prevail when this comes to his defense.

But it's definitely the case that his desires to control his defense at times put him in conflict with his lawyers. And when the lawyers don't do what he wants, he threatens to fire them, he makes them drive all the way up to Berlin and then refuses to see them so they have to turn around and drive away. He does things to express his displeasure and disagreement with the lawyers who are proposing that he do certain things and proposing that the lawyers not do other things that he wants them to do.

But disagreement, even strong disagreement, with your lawyers does not prevent you from being able to properly assist in your defense. You don't have to like your lawyer. You don't have to have a warm, trusting relationship with your lawyer. Very few of the defendants I see in front of me are fully trusting of their lawyers. And why should they? You know, they -- and people have widely inaccurate views about lawyers.

I would say 30, 40 percent of the defendants that appear from front of me think a court-appointed lawyer is not as good as a retained lawyer; that a public defender is not as good as a private practitioner. I'm sorry; the best lawyers in the state of New Hampshire are our public defenders and everybody who knows -- who understands the system knows that. Most defendants don't understand that. And the people that get on our CJA list, you've got to be one of the better lawyers to get on the CJA list.

So the idea that you're a court-appointed lawyer, that you're not going to be as effective, it's a widely held view, but it's wrong. And the fact that you don't like it or trust your lawyer because they're court-appointed or because they won't do what you say doesn't mean you lack the capacity to assist with your defense. And the problem here is not -- with his conflict with lawyers, the problem is not his CPTSD. It's his wanting to control his defense and not being willing to tolerate it when people don't give him what he wants.

Now, I do think the other feature that is important here is that he has problems controlling his anger and that is to some extent a product of his -- his mental health condition. So I recognize that and I -- that's not uncommon for people with PTSD, to have problem controlling anger.

I will say to you any private settings with lawyers, he does have problem controlling anger. I know this from all

the interactions lawyers have had with him. I also have had many interactions with him in a court setting where he's -- he's being given information that makes him unhappy. He is able to control himself when he thinks it's in his interest to control himself and usually he thinks it's in his interest to control himself with me. And I hope with respect to a jury, he will see it as in his interest to control himself because we all know the one thing that will hurt him more than anything else is if he doesn't control himself. That feeds the exact prosecution theory, right?

So it would be the worst thing imaginable if he couldn't control himself, but he's able, I think, to think strategically and he's not going to present that side of himself to a jury and he doesn't for the most part with me if I treat him respectfully. I try to treat him with the respect that I treat every litigant in front of me and when I treat him with respect, he tends to respond.

And so I -- I think the problem is, yes, he does have a violent temper, but he also thinks there are times when you need to use your temper to gain things that you want to gain. And he uses it strategically. And it is not -- his distrust of lawyers, in my view, is not related to his -- his mental disease or defect. It's related to his frustrations with lawyers generally, his distrust of the system, and the difficult situation in which he finds himself.

And that distrust of lawyers does not -- and that is a very common set of problems for people who are -- I mean I've spent a significant chunk of my life sitting in *in camera* review sessions with defendants who want to fire their lawyer. Okay? It happens probably 50 times a year to me that I do that. Clients never like it because a lot of the clients find themselves in impossible situations. And when your lawyer can't make it go away, you all have been there, I'm sure, they get mad and they try to fire you. But I've given him three chances on the new lawyers and I'm not doing that anymore and I'm not in any way satisfied that -- that his difficulties with lawyers is the product of his mental disease.

And so I think the government has proved to me here -- and to the extent that the reports are in conflict, I find the government's report to be more persuasive except on the issues that I've identified. I think the government report -- Dr. Sunder has a different understanding of what the legal term mental disease or defect means than my understanding. I also think that she doesn't -- that Dr. Mart has a better sense of how PTSD affects Mr. Glenn than Dr. Sunder does. But I otherwise agree with her report and her analysis and the facts on which she bases her conclusions.

And so I believe both parts of the *Dusky* test have been satisfied. No one here argues otherwise. And, accordingly, I find that the government has proved by a

preponderance of the evidence that the defendant is competent to stand trial.

I am open to receiving an *ex parte* motion from the defense seeking Court permission to appoint a psychiatrist to evaluate Mr. Glenn for the purposes of determining whether he would be aided in his ability to work with counsel by considering medication. That motion should identify the psychiatrist, what the compensation structure is, and what the psychiatrist proposes to do. And I would also expect to see in that motion that you can represent that Mr. Glenn has agreed and, you know, subject to a final decision based on what medications are proposed, he is amenable to taking medication such as that proposed by Dr. Mart.

MR. CLOHERTY: I -- I do want to say, your Honor, at least before today, he was -- I laid out this -- obviously I got Dr. Mart's report on maybe Tuesday of this week and I laid out that proposal to him and he has been amenable on that front.

THE COURT: Represent that it continues, because it's day-to-day with him.

MR. CLOHERTY: I don't know what tomorrow holds, but that's at least our current position and that's what I understand his position to be. So I'll share that with you.

THE COURT: Okay. So you can submit that *ex parte* motion as soon as possible and I'll -- I'm inclined, if I see

those -- the -- a reputable psychiatrist evaluate for the purposes of those medications Dr. Mart is suggesting and for the purpose of -- and you might be able do it through a telephone consult, given that we already have this detailed record.

If the psychiatrist was willing to read the report, engage in a telephonic consult, and if the psychiatrist is comfortable prescribing on the basis of that telephone call and he's -- and Glenn's willing to take it, I'm happy to then follow up with an order saying, you know, Judge, I've had a psychiatrist evaluate, he agrees, Glenn agrees, please order the -- the Marshals Service to arrange for him to get the medications that he needs. And then you could file a motion to continue -- to continue the case because usually you need 30 days on the meds before they start to work in a sufficient way. If you can represent those things, I'm willing to grant that and I'm willing to grant a continuance, a brief one.

I know you're probably opposed, but it would be just brief. It would be for this purpose only and that would be it. And I hope that I will have demonstrated to Mr. Glenn that I'm not going to put up with stay in a cell anymore. I'm going to go with him if he isn't willing to come to court. I'm not willing to grant any more continuances after this. I'm going to go to -- I'm going to move ahead with the trial. If he doesn't show up, he isn't going to come, we're just going to go

without him.

All right. So do you have any thoughts about the continuance part of this?

MR. GREEN: The continuance -- I guess it's kind of wait and see. I don't -- so long as those conditions are met --

THE COURT: Yeah.

MR. GREEN: -- I don't.

I -- Mr. Cloherty and I had had this discussion, actually, prior to coming in and it was along those lines, well, this hearing is about competence, is he competent or not. And I -- whatever medications he needs or is prescribed or wants is not really in my purview. I don't take a position on it.

THE COURT: The only part of it is the continuance. If, you know, like, my witnesses are complaining and they're going to disappear if I don't get it done and --

MR. GREEN: I would have to -- the only issue is that I know what is currently set, our key witness, the alleged victim, is available. I would have to consult with her.

THE COURT: We would accommodate her schedule if we needed to change it.

MR. GREEN: Understood.

MR. CLOHERTY: So I appreciate that, your Honor. I'll, of course, work with Mr. Green to make sure that we're

proposing something that works for both sides.

And then in terms of the motion, I -- it is my hope, standing here today, that I am able to get that to you before Christmas, hopefully very soon.

THE COURT: The sooner you get it, the sooner it'll get approved. And I think if you can find a psychiatrist that's willing to do a telephonic consult, it might be easier to find somebody than if you find somebody that has to go out to the prison, you know.

MR. CLOHERTY: I agree with all of those recommendations. My -- it is an unfortunate set of weeks to work through, but I'm going to find someone and do everything I can. And I guess I'll wait to see what I submit.

THE COURT: Okay. Last thing. Your motion to dismiss is pending. I initially suggested to you that I was prepared to give you a hearing. I'm disinclined to do that at the moment. I can decide this on the papers. I was trying to do that as an accommodation to Mr. Glenn, but it isn't necessary for me, and I don't want to work through another issue like this. I'm not -- I'm going to hold as few hearings as possible between now and the trial and if he doesn't show up for the trial, I'm going to go ahead without him. That's -- that's all there is to it. Your objection's noted, but I -- I have been as patient as a judge can be with Mr. Glenn and I'm at the end of it.

MR. CLOHERTY: Again, just to advance my client's position, he does want a hearing on that motion. I'm hearing that the Court --

THE COURT: You made your request and I've decided that given the uncertainty of his willingness to appear, I'm not inclined to give it to him. So I'm going to go ahead and rule on those on the papers.

All right. Anything else?

MR. GREEN: No, your Honor. Thank you.

THE COURT: Okay. Thank you.

MR. CLOHERTY: Thank you.

THE CLERK: All rise.

(Proceedings concluded at 12:50 p.m.)

C E R T I F I C A T E

I, Liza W. Dubois, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings, to the best of my knowledge, skill, ability and belief.

Submitted: 3/24/26 *_/s/ Liza W. Dubois_*
LIZA W. DUBOIS, RMR, CRR